J-S51023-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ANTONIO M. JOHNSON | |
| Appellant | No. 2271 MDA 2013 |

Appeal from the Judgment of Sentence November 18, 2013
In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-CR-0007270-2011

BEFORE:  BOWES, J., OTT, J., and MUSMANNO, J.

MEMORANDUM BY OTT, J.:　　　　　　　　　**FILED FEBRUARY 18, 2015**

Antonio M. Johnson appeals from the judgment of sentence imposed on November 18, 2013, in the Court of Common Pleas of York County.  On September 12, 2013, a jury found Johnson guilty of first-degree murder, criminal conspiracy to commit first-degree murder, two counts of criminal attempt to commit homicide, and two counts of aggravated assault.[1]  The court sentenced Johnson to an aggregate term of life imprisonment without the possibility of parole, plus 20 to 40 years' incarceration.  On appeal, Johnson raises one issue, asserting the trial court erred in granting the Commonwealth's motion *in limine*, with respect to his expert witness,

---

[1] 18 Pa.C.S. §§ 2502(a), 903(c), 901(a), and 2702(a)(1), respectively.

Johnathan L. Arden, M.D. After a thorough review of the submissions by the parties, the certified record, and relevant law, we affirm.

The facts and procedural history are as follows. On September 18, 2011, at approximately 4:30 a.m., Rudolph Mendoza, Darvin Allen, and Johnson were in a car, driving back from a party in York, Pennsylvania. Mendoza saw an individual, Angel Rengifo, with whom he apparently has an acrimonious relationship, standing outside a residence located at 155 South Queen Street. The three men agreed to "get"[2] Rengifo, so they decided to park the car one block away on Poplar Street and then walk down an alleyway to a breezeway that cuts between the buildings located on South Queen Street. Mendoza was observed carrying a .9-millimeter gun while Johnson handled a .40 caliber firearm. As soon as Mendoza and Johnson got out of the breezeway, they started firing the guns at two men standing outside the residence, Rengifo and Brandon DeJesus.[3] After being hit, Rengifo and DeJesus ran into the home, and subsequently went to the hospital. Rengifo was struck in the pelvis area and DeJesus was shot in the abdomen. Both men survived and were released after receiving treatment.

During the shooting, Mendoza passed in front of Johnson and was struck by a bullet fired by his co-conspirator. The bullet went in his shoulder

_____

[2] N.T., 9/9/2013-9/12/2013, at 319.

[3] Rengifo testified he did not have a weapon and he did not observe DeJesus with a weapon. *Id.* at 146-147.

- 2 -

and then through his neck. Mendoza and Johnson fled back through the breezeway. Mendoza made his way to an empty lot, where he bled out as a result of being struck by the bullet. Johnson went to Poplar Street, where Allen was waiting, and handed him the .9-millimeter gun that Mendoza was carrying. Officers from the York City Police Department responded to the scene. They observed a blood trail and eventually found Mendoza, un-responsive, in the lot. Johnson was subsequently arrested, and charged with multiple offenses related to the shooting.

Prior to trial, Johnson's counsel indicated that he would be calling forensic pathologist, Dr. Arden, to testify on Johnson's behalf. On August 29, 2013, the Commonwealth filed a motion *in limine* to preclude certain testimony from Dr. Arden with respect to the position of the shooter relative to Mendoza and as to the movements of Mendoza immediately prior to him being shot. The Commonwealth argued the subject matter was beyond the scope of the pathologist's area of expertise for him "to determine the position of a shooter relative to the victim" and "as to how an individual would or should respond to gunfire." Motion *in Limine*, 8/29/2013, at ¶¶ 6-7.

The matter proceeded to trial on September 9, 2013. The Commonwealth introduced its expert forensic pathologist, Marianne Hamel, M.D. Dr. Hamel testified she did an autopsy of Mendoza and determined he died of a gunshot wound to the left shoulder. ***See*** N.T., 9/9/2013-

9/12/2013, at 293. She indicated the bullet entered the back of Mendoza's shoulder and then exited the front of his neck. *Id.* at 310 ("[T]he bullet traveled back to front, left to right, and upward."). After the Commonwealth's case-in-chief, a proceeding was held on September 11, 2013, with regard to Johnson's motion *in limine*. The trial court granted the Commonwealth's motion, finding the topic of how Mendoza received the gunshot wound was beyond Dr. Arden's area of expertise, and was a question for the jury sitting as the fact-finder. *Id.* at 411-417. At the conclusion of the case, the jury returned a verdict on September 12, 2013, finding Johnson guilty of first-degree murder (as to Mendoza based on transferred intent),[4] criminal conspiracy to commit first-degree murder (Mendoza), two counts of criminal attempt to commit homicide (as to Rengifo and DeJesus), and two counts of aggravated assault (as to Rengifo and DeJesus).

On November 18, 2013, the court sentenced Johnson to a mandatory term of life imprisonment without the possibility of parole for the murder conviction, two terms of 20 to 40 years' incarceration for the attempted criminal homicide convictions, and two terms of five to 10 years'

---

[4] *See Commonwealth v. Jones*, 912 A.2d 268, 279 (Pa. 2006) (citing the doctrine of transferred intent, 18 Pa.C.S. § 303(b)(1), pursuant to which "the intent to murder may be transferred where the person actually killed is not the intended victim").

imprisonment for the aggravated assault offenses.[5]  All sentences were consecutive to the first-degree murder but concurrent to each other.  This timely appeal followed.[6]

In his sole issue, Johnson claims the trial court erred in granting the Commonwealth's motion *in limine* with respect to limiting trial counsel's questioning of his expert witness, Dr. Arden, as to his opinion that the bullet trajectory and characteristics of Mendoza's wound could have come from "return fire" and not Johnson's gun.  Johnson's Brief at 4.  Specifically, he states:

> The trial court limited the scope of counsel's inquiry of Dr. Arden to opinions criticizing the Commonwealth's expert's autopsy report.  The trial court's rationale was that opinions expressed in Dr. Arden's report about an alternate theory of "return fire," if presented to the jury, invaded the province of the jury as a fact-finder and went beyond the scope of Dr. Arden's expertise as a forensic pathologist.  However, Dr. Arden's opinions were based on facts in the record and his analysis of the bullet trajectory in Mendoza's body.  Such testimony falls squarely into his area of expertise as a forensic pathologist.  The limitations, thus, imposed by the trial court precluded [Johnson] from presenting a legitimate alternate theory, resulting in an unfair trial.

---

[5]  The court determined the conspiracy merged with the murder conviction for sentencing purposes.

[6]  During this time, trial counsel filed a motion to withdraw, which was granted.  The trial court then appointed new counsel.  On January 4, 2014, the trial court ordered Johnson to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).  After receiving an extension, Johnson filed a concise statement on February 10, 2014.  The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on March 7, 2014.

*Id.* at 12. Moreover, he argues it is improper for a court "to so severely limit the testimony of a defense expert that a defendant has no alternate theory to pose to the jury." *Id.* at 13. He states that while both Dr. Hamel and Dr. Arden agreed Mendoza was killed by a bullet that entered his shoulder, traveled left-to-right across his body and exited his neck, "[t]hey differed in the theory of where the bullet came from." *Id.* Johnson contends he merely "wanted to pose hypotheticals to introduce" the alternative theory of return fire. *Id.* at 14. He asserts, "Significant to Dr. Arden's analysis was the actual wound channel in Mendoza's body being left-to-right as opposed to front-to-back. This directly contradicts the Commonwealth's theory that Mendoza stepped in front of Johnson as Johnson was firing." *Id.* Johnson concludes, "Dr. Arden opining as to how facts in the area of crime scene investigation impact his opinion as a forensic pathologist is perfectly acceptable." *Id.* at 15.

We begin with our well-settled standard of review:

> When ruling on a trial court's decision to grant or deny a motion *in limine*, we apply an evidentiary abuse of discretion standard of review. The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal "unless that ruling reflects 'manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.'"

*Commonwealth v. Minich*, 4 A.3d 1063 (Pa. Super. 2010) (citations omitted). Moreover,

[t]he basic requisite for the admissibility of any evidence in a case is that it be competent and relevant. Though 'relevance' has not been precisely or universally defined, the courts of this Commonwealth have repeatedly stated that evidence is admissible if, and only if, the evidence logically or reasonably tends to prove or disprove a material fact in issue, tends to make such a fact more or less probable, or affords the basis for or supports a reasonable inference or presumption regarding the existence of a material fact.

*Commonwealth v. Freidl*, 834 A.2d 638, 641 (Pa. Super. 2003) (citation omitted). Likewise,

Pennsylvania courts permit expert testimony as an aid to the jury when the subject matter is distinctly related to a science, skill, or occupation beyond the knowledge or experience of the average layman. Conversely, expert testimony is not permitted on matters of common knowledge. Expert testimony may not be used to bolster the credibility of witnesses because witness credibility is solely within the province of the jury.

*Commonwealth v. Johnson*, 690 A.2d 274, 276 (Pa. Super. 1997) (citations and quotation marks omitted). *See also* Pa.R.E. 702.

Here, the trial court found the following:

In this case, Commonwealth witness Marianne Hamel, a Forensic Pathologist Medical Examiner, testified that a Forensic Pathologist specializes in the effects of trauma and diseases on the human body, and performs autopsies and attempts to determine the cause and manner of death.

Dr. Jonathan Arden is also a forensic pathologist, and testified as an expert in that area. However, a portion of his report goes outside his area of expertise. Specifically, in the last paragraph of page four (4) and continuing onto page five (5) of his report, Dr. Arden discusses "the implications of the evidence from the shooting scene for the shooting scenario, namely how Mr. Mendoza was shot." In this discussion, he makes a factual determination as to who was carrying what gun based on a statement by "Mr. Allen," speculates as to where Mr. Mendoza was standing while he was shooting and what position he was in,

and speculates where he would have gone after firing his weapon. Dr. Arden then uses these factual determinations and speculations to determine the origin of the bullet that killed Rudolph Mendoza. Because these determinations are either factual determinations to be made by the jury and/or are outside the expertise of a forensic pathologist, the Trial Court properly granted the Commonwealth's Motion in Limine regarding Dr. Arden's report.

Trial Court Opinion, 3/7/2014, at 3-4 (record citations omitted).

The court's rationale for limiting Dr. Arden's testimony demonstrates its decision was not an abuse of discretion. Dr. Arden testified forensic pathology involves the investigation and certification of deaths, particularly examining the effects of disease and/or injuries "in the form or the function of the human body or its components." N.T., 9/9/2013-9/12/2013, at 477. In his expert report, Dr. Arden opined, in relevant part:

The final area to discuss is the implications of the evidence from the shooting scene for the shooting scenario, namely how Mr. Mendoza was shot. According to Mr. Allen, Mr. Johnson was carrying the .40 caliber gun and Mr. Mendoza the 9 mm gun. An analysis photograph provided to me indicated that the 9 mm ejected casings were mostly located in the sidewalk and street (close to the curb) in front of the windows of 149 S. Queen St., and the .40 caliber casings were mostly in the street in front of 147 S. Queen St. and the breezeway between 147 and 145 S. Queen St. This indicates that the shooter using the .40 caliber was closer to the breezeway that they eventually left through, and the shooter using the 9 mm was on the sidewalk closer to what they were shooting at (155 S. Queen St.). Note also that the green plastic recycling container was on the sidewalk at the curb of 149 S. Queen St., and that the blood trail starts on the sidewalk in front of 149 S. Queen St., between the building and the recycling container. The trajectory of the gunshot wound to Mr. Mendoza was predominantly from his left to his right. If the 9mm shooter (purportedly Mr. Mendoza) were standing on the sidewalk closer to the "target" area, his back would likely be turned to the .40 caliber shooter, which does not place him in

the proper relative positioning to be shot in his left shoulder and have the bullet travel from his left to his right. Furthermore, if he were standing on the sidewalk in front of the front windows of 149 S. Queen St. facing and firing toward 155 S. Queen St., the front stairs and the stoop of 149 S. Queen [St.] would be behind him, blocking his egress to the breezeway. If after firing he had reason to exit or retreat, he would most likely turn to his right to proceed along the sidewalk in front of 149 and 147 S. Queen St. to get to the breezeway (because if he turned to his left he would be facing into the building and would be positioned to walk along the building and be blocked by the steps). If indeed he did turn to his right to leave, he would then be presenting to his left side to 155 S. Queen St. in such a way that gunfire originating from 155 S. Queen [St.] (or that direction) would be traveling in a direction to strike him in his left shoulder and follow a course through his body predominantly to his right, as was demonstrated by the autopsy and autopsy photographs.

He would also be positioned in the same area as the beginning of the blood trail on the sidewalk, near the recycling container. Therefore, the evidence is consistent with Mr. Mendoza having been shot from returning fire from the direction of 155 S. Queen St. while he was on the sidewalk in front of 149 S. Queen St., turning to his right to leave through the breezeway between 147 and 145 S. Queen St.

Report of Consultation, Re: PA v. Antonio M. Johnson (CCP, York Co., No. CR-7270-2011), 3/29/2013, at 4-5.

Indeed, this "alternate theory" portion of Dr. Arden's opinion is largely based on speculation regarding Mendoza's position during the shooting and falls outside of the area of his expertise as a forensic pathologist.[7, 8]

_____

[7] As noted by the Commonwealth, this "expected testimony would likely be akin to the testimony of a crime scene reconstructionist, which Dr. Arden is not." Commonwealth's Brief at 6.

Moreover, as indicated by the trial court, these factual/credibility determinations are to be made by the jury sitting as the fact-finder. ***See Johnson***, ***supra***. Accordingly, the trial court did not abuse its discretion in limiting Dr. Arden's testimony. Therefore, we conclude Johnson's claim that the trial court erred in granting the Commonwealth's motion *in limine* fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/18/2015

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯

[8] We note that Johnson's reliance on ***Commonwealth v. Jones***, 327 A.2d 10 (Pa. 1974), to demonstrate an expert may pose an alternate theory is misplaced. In ***Jones***, the Pennsylvania Supreme Court held that psychiatric expert testimony as to the defendant's below normal mental capacity was admissible in determining the voluntariness of his confession. ***Id.*** at 13. Here, Dr. Arden's testimony regarding Mendoza's location and movements during the shooting was outside the scope of his forensic pathologist expertise.